# EXHIBIT A

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 2 of 45

SUPREME COURT of the STATE OF NEW YORK
COUNTY OF WESTCHESTER

----------------------------------------------------------------x

PAULA DINU, on behalf of herself
and all others similarly situated,

                                    Plaintiff,

                                                            **SECOND AMENDED
                                                            COMPLAINT**

            -against-
                                                            Index No.  55604/2025

NORTHWELL HEALTH, INC., MICHAEL J. DOWLING,
VASSAR BROTHERS HOSPITAL,
NORTHERN WESTCHESTER HOSPITAL, INC.,
LONG ISLAND JEWISH MEDICAL CENTER,
NORTH SHORE UNIVERSITY HOSPITAL,
SOUTH SHORE UNIVERSITY HOSPITAL,
STATEN ISLAND UNIVERSITY HOSPITAL,
                                    Defendants.

----------------------------------------------------------------x

            PLAINTIFF PAULA DINU, through the DIEDERICH LAW OFFICE, complains of the

DEFENDANTS as follows:

## PREFATORY STATEMENT

This is a hybrid individual and class action for damages is brought by Plaintiff Paula
Dinu ("Ms. Dinu") against the above-named hospitals and Michael Dowling (collectively, the
"Hospital Defendants") for engaging in a group boycott (i.e., blacklisting) in restraint of trade
harming Ms. Dinu and similarly situated former employees within Northwell Health, Inc.'s
("Northwell's") the network of affiliated hospitals and healthcare facilities, each of which
operates as a separate economic entity in competition with each other.  The Hospital Defendants
are members of an ever-expanding "Northwell network" which creates a monopoly (monopsony)
as the only potential buyer of blacklisted healthcare professionals' services within substantial
portions of this region of New York State.  Excluding blacklisted persons' labor and services
("product") from the New York State labor market burdens intrastate commerce. The Hospital
Defendants have "agreed" and "arranged" to this group boycott (blacklisting), essentially
allowing Northwell, as the Hospital Defendants' exclusive staffing agency, to exclude candidates
who have previously alleged unlawful conduct against any one of the affiliates and thus are view
as disfavored or deemed adversarial.

This conduct violates the Donnelly Act, General Business Law (GBL) § 340, as it
constitutes a "contract, agreement, arrangement or combination whereby [a] monopoly … in the
furnishing of any service … may be established … or … whereby Competition … or in the
furnishing of any service … is or may be restrained…."

After being demoted and thereafter fired by Phelps Hospital in 2023, Ms. Dinu has been blacklisted by the Northwell consortium.  She estimates that scores of employee (between 50 and 90) have been similarly injured by Defendants' collusion, resulting in damages totaling up to $4 million in compensatory damages (treble damages are not sought by the class).

This blacklisting is tortious, as it also interferes with Ms. Dinu's, and the proposed class, right to prospective economic advantage.

# Contents

Prefatory Statement ........................................................................................................... 1

The Parties ......................................................................................................................... 3

Factual Allegations ........................................................................................................... 4

Overview ........................................................................................................................... 4

**Defendants' Restraint of Trade** ...................................................................................... 6

A.        Defendants' collusion to deny Ms. Dinu re-employment ...................................... 6

    i.      Revocation of Ms. Dinu's hospital privileges in entire Northwell healthcare system – preventing her work as an independent contractor ...................... 7

    ii.     "Do Not Re-hire" boycott .......................................................................... 8

    iii.    Nuvance application—Ms. Dinu blackballed outside Northwell system ........... 9

B.        Northwell as monopsonist ................................................................................. 9

C.        Northwell's increasing concentration of market power ...................................... 13

D.        Hospital Defendants' group boycott (blacklisting) in Restraint of Trade ........... 14

E.        Northwell affiliates are "separate business entities" and compete against each other ........ 15

F.        Price-fixing by Northwell as the job application gatekeeper ............................... 19

G.        Embracing Lawlessness equates to Price-fixing using an illegitimate and anticompetitive condition .................................................................................. 21

H.        A retroactive, unilaterally imposed Covenant Not to Compete ........................... 24

I.        Northwell takeover of community hospitals with, e.g., interlocking Boards of Directors . 25

    i.      Blacklisting candidates for Northwell's non-profit community hospitals is anticompetitive .......................................................................................... 25

J.        A group boycott "arrangement" ......................................................................... 27

K.        100,000+ employees affected by the anticompetitive illegality ........................... 28

    i.      The Northwell network is restraining competition both locally and regionally ......... 29

    ii.     Blacklisting for Whistleblowing is anticompetitive, because it chills the exercise of rights 30

L.        The Hospital Defendants' reasons for blacklisting Ms. Dinu are unlawful ....................... 33

M.        No antitrust exemption applies to Ms. Dinu ....................................................... 35

N.        Ms. Dinu has been damaged greatly by Northwell actions in restraint of trade ................ 35

O.        Appropriate Declaratory Relief .......................................................................... 36

**Class Action Allegations** ............................................................................................... 37

A.        Numerosity – CPLR 901(a)(1) .......................................................................... 37

B.        Commonality – CPLR 901(a)(2) ........................................................................ 38

C.        Typicality – CPLR 901(a)(3) ............................................................................. 38

D.        Adequacy – CPLR 901(a)(4) ............................................................................. 38

2

E.          Predominance – CPLR 901(a)(2) & 902 ............................................................. 39
F.          Superiority – CPLR 901(a)(5) ............................................................................. 39
            First Cause of Action-- Violation of the Donnelly Act Damaging Ms. Dinu ................... 40
            Second Cause of Action-- Violation of the Donnelly Act Damaging the Proposed Class .. 42
            Third Cause of Action—Interference with Prospective Advantage ................................. 43

## THE PARTIES

1.          Plaintiff Paula Dinu is, and was at all times relevant herein, citizen of the United States and a resident of the Town of Fishkill, County of Dutchess, State of New York.

2.          Defendant Michael J. Dowling ("Defendant Dowling" or "CEO Dowling") is the president and chief executive officer of Northwell Health, Inc. ("Northwell"), and, upon information and belief, resides in Nassau County in the State of New York.  He is sued in both his individual and corporate capacities.

3.          Defendant Northwell Health, Inc. is, and at all times relevant herein was, a not-for-profit corporation organized and existing under the laws of the State of New York.

4.          Defendant Vassar Brothers Hospital, a/k/a/ Vassar Brothers Medical Center, is and at all times relevant herein was a not-for-profit corporation organized and existing under the laws of the State of New York, with offices located at Vassar Medical Center, 45 Reade Place, Poughkeepsie, NY 12601.

5.          Defendant Long Island Jewish Medical Center is, and at all times relevant herein was, a not-for-profit corporation organized and existing under the laws of the State of New York, with offices located at 270-5 76th Avenue, New Hyde Park, NY 11040

6.          Defendant North Shore University Hospital is, and at all times relevant herein was, a not-for-profit corporation organized and existing under the laws of the State of New York, with offices located at 300 Community Drive, Manhasset, NY 11030.

7.          Defendant South Shore University Hospital, a/k/a Bay Shore University Hospital,

3

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 5 of 45

is, and at all times relevant herein was, a not-for-profit corporation organized and existing under the laws of the State of New York, with offices located at 301 East Main Street, Bay Shore, NY 11706.

8.     Defendant Staten Island University Hospital is, and at all times relevant herein was, a not-for-profit corporation organized and existing under the laws of the State of New York, with offices located at 475 Seaview Avenue, Staten Island, NY 10305.

9.     Defendant Northern Westchester Hospital, Inc. is, and at all times relevant herein was, a not-for-profit corporation organized and existing under the laws of the State of New York, with offices located at 400 East Main Street, Mount Kisco, NY 10549  (together with the above Defendants, the "**Hospital Defendants**").

**FACTUAL ALLEGATIONS**

## Overview

10.     Plaintiff Paula Dinu is a 52-year-old woman who has worked at (non-defendant) Phelps Hospital, a/k/a "Phelps Memorial Hospital Association," for over 15 years, first as Deputy Director of Speech and Audiology, and then as Director.

11.     After complaining in 2021 and spring of 2022 about unlawful gender and disability discrimination and harassment, Phelps Hospital retaliated by demoting her to Staff Therapist on May 2, 2022, after she sought to protect the safety of a pediatric patient on October 20, 2022, and subsequently terminated her employment on January 13, 2023.[1]

12.     After Ms. Dinu's May 2, 2022 demotion, the Defendants Northwell and its CEO, Michael Dowling, allowed and condoned unlawful retaliation against Ms. Dinu because of her

---

[1] A detailed description of these underlying facts can be found in the Amended Complaint filed on September 22, 2025 in Ms. Dinu's federal lawsuit, *Dinu v. Northwell Health et al*., 25 Civ. 3281 (SDNY).

4

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 6 of 45

opposition to Northwell's and (non-party) Phelps Hospital's unlawfulness.[2]

13.    After Ms. Dinu's demotion, Northwell engaged in creating a group boycott (blacklisting) of Ms. Dinu within its network of "affiliated" hospitals, which boycott was condoned by Northwell's CEO, Defendant Dowling.

14.    After the termination of Ms. Dinu by Northwell and one of its affiliates (non-party Phelps Hospital), Northwell's blacklisting of Ms. Dinu continued, creating an unlawful group boycott by Northwell and all of its affiliated hospitals.

15.    This group boycott is an "arrangement" within the meaning of the Donnelly Act—namely an express or implied "contract, agreement, arrangement or combination that restrains competition" by preventing qualified people from being considered for the services the healthcare professional is otherwise able to provide.  *See*, N.Y.S. General Business Law § 340.

16.    In connection with Northwell's and CEO Dowling's conduct, which relates to this action, Ms. Dinu has commenced several lawsuits.[3]

17.    Northwell's group boycott of Ms. Dinu and similarly situation employees, in restraint of trade, as described below.

---

[2] *Id.*

[3] Ms. Dinu originally filed *Dinu I*, and then because of the unlawful and unethical conduct of the Attorney Defendants, was forced to file *Dinu II* (alleging Labor Law § 741 reprisal for endeavoring to protect a 6 year old child).   Both those cases are now on appeal.  Because *Dinu II* was dismissed for lack of service (personal jurisdiction), Ms. Dinu was forced to file *Dinu III (pending before this Court)*.  At around that time she received an EEOC Notice of Right to Sue, and therefore sued in federal court, *Dinu V*, for sex and disability discrimination and reprisal.

  *See*, *Dinu v. Northwell Health Inc. et al*, Dutchess County Index No. 2022-52531, and Appellate Division Second Department No. 2023-08373 ("***Dinu I***"); *Dinu v. Phelps Memorial Hospital Association,* Dutchess County Index No. 2023- 50184, and Appellate Division Second Department Nos.2023-8770 and 2023-12361 ("***Dinu II***"); *Dinu v. Phelps Memorial Hospital Association, et al*, Westchester County Index No. 55525/2025 ("***Dinu III***");  *Dinu v. Northwell Health Inc. et al*, Westchester County Index No. 55604/2025 ("***Dinu IV***") (the present case) and *Dinu v. Northwell Health, Inc. et al*, 25 Civ. 3281 (JGLC) (SDNY) ("***Dinu V***").

5

# DEFENDANTS' RESTRAINT OF TRADE

### A. **Defendants' collusion to deny Ms. Dinu re-employment**

18.     As stated above, Ms. Dinu was fired by Northwell and Phelps Hospital and thereafter blacklisted throughout Northwell's entire network of affiliated hospitals.

19.     Following her termination by Phelps Hospital, Ms. Dinu applied for speech pathology jobs at each of Northwell's affiliates named as a defendant herein, including re-applications over the preceding months.

20.     Ms. Dinu was eminently qualified for each of the jobs she sought.

21.     When Ms. Dinu applied for a job with one Northwell affiliate, Northwell—not the affiliate—informed Ms. Dinu that her application was rejected.

22.     Some of Northwell's affiliated hospitals indicated a strong interest in Ms. Dinu's candidacy, even indicating that she would be interviewed for the position.

23.     However, in no instance was she given an interview.

24.     In recent months in 2025, Ms. Dinu applied for, but was blacklisted from, speech pathology positions at:

> ➢ Vassar Medical Center, a/k/a Vassar Brothers Medical Center
> ➢ Northern Westchester Hospital, Inc.,
> ➢ Long Island Jewish Medical Center,
> ➢ North Shore University Hospital,
> ➢ South Shore University Hospital, a/k/a Bay Shore University Hospital and
> ➢ Staten Island University Hospital.

25.      Ms. Dinu was eminently qualified for each position she applied for, and undoubtedly possessed far greater education and experience than the candidates ultimately selected for the job.

26.     Ms. Dinu was not considered, or given an interview, upon information and belief

Case 7:25-cv-09972-JGLC     Document 1-1     Filed 12/01/25     Page 8 of 45

because of the Defendants' blacklisting and group boycott.

27.     Upon information and belief, Ms. Dinu is blacklisted within the entire Northwell system of healthcare facilities.

28.     Upon information and belief, when Ms. Dinu and similarly situated former employees apply for a job with Northwell or any of its affiliates, the application is tagged with an indication such as "DNR" (do not re-hire).

29.     This blacklisting seriously impaired, and impairs, Ms. Dinu's (and similarly situated ex-employees) ability to obtain suitable employment or work based upon overall qualifications such as education, skill and experience.

### i. Revocation of Ms. Dinu's hospital privileges in entire Northwell healthcare system –preventing her work as an independent contractor

30.     The Hospital Defendants, coordinated by Northwell, unilaterally revoked Ms. Dinu's hospital privileges throughout the Northwell network of affiliates in 2023.

31.     In so doing, the Hospital Defendants' group boycott and refusal to deal extended to Ms. Dinu not only as a prospective employee, but also as a prospective independent healthcare contractor as a speech pathologist.

32.     At the time Ms. Dinu was terminated by Phelps Hospital, the Hospital Defendants revoked her hospital privileges within the entire Northwell healthcare system, including all of the Northwell's affiliates, thus preventing Ms. Dinu from working as a healthcare consultant in her field within the entire Northwell system.

33.     Revocation of Ms. Dinu's hospital privileges was not reasonably related to Northwell's or Phelps Hospital's (unjustified) criticism of Ms. Dinu.

34.     Defendant Northwell and one or more of the other Defendants knew the revocation was unwarranted, because the revocation letter falsely characterized the loss of

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 9 of 45

privileges as "voluntary" and at Ms. Dinu's request.

35.     Ms. Dinu was damaged by Northwell's involuntarily revocation of her hospital privileges within its entire healthcare system, which was unreasonable, as there was never any question by Phelps Hospital or Northwell regarding her professional skill and competency.

36.     Northwell unilaterally characterized Ms. Dinu's loss of hospital privileges as a "resignation."

37.     Ms. Dinu did not resign her hospital privileges within the Northwell system.

38.     Phelps Hospital's termination of Ms. Dinu's employment had nothing to do with her professional competency or skills as a speech pathologist.

39.     This action by the Hospital Defendants in boycotting Ms. Dinu as a potential healthcare contractor is in restraint of trade.

### ii.     "Do Not Re-hire" boycott

40.     Upon information and belief, Northwell, serving as the exclusive staffing agency for all Northwell affiliates (and now Nuvance as well), including the Hospital Defendants herein, with their agreement and consent, has blacklisted Ms. Dinu as a "DNR" or "do not re-hire" candidate for employment and for independent provision of services requiring "hospital privileges."

41.     This amounts to a group boycott, a refusal to deal and a hiring ban, and as such should be deemed a *per se* violation of state antitrust law.

42.     It is an unreasonable restraint of trade for a group of separate corporations—the Hospital Defendants—to agree or arrange that a provider of professional services – a person such as Ms. Dinu – be excluded from the marketplace because of lawfully complaining of unlawful action by one or more of the Hospital Defendants.

43.     It is particularly unjustified for a group of separate corporations to agree to

8

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 10 of 45

boycott and refuse to deal with an individual who has angered a member of the Northwell network of "affiliated" hospitals by reporting unlawful discrimination or by engaging in protected whistleblowing activity protecting to safeguard patient safety.

44.     Such lawful activity made Ms. Dinu a disfavored or potentially adversarial candidate for employment in the Defendants' eyes, thus motivating their concerted refusal to hire and boycott.

### iii.    Nuvance application—Ms. Dinu blackballed outside Northwell system

45.     Ms. Dinu was also blacklisted outside Northwell's consortium of hospitals.

46.     Specifically, Ms. Dinu applied to a Nuvance[4] hospital (Vassar Brothers Hospital/Vassar Brothers Medical Center) for employment both prior to, and after, Nuvance recently agreeing to merge or otherwise become affiliated with Northwell.

47.     Upon information and belief, Ms. Dinu was denied employment by Nuvance because Northwell communicated to Nuvance, Ms. Dinu was a "do not hire" or otherwise blacklisted within the Northwell network.

## B.  Northwell as monopsonist

48.     With well over 88,000 employees (and perhaps over 100,000 employees after its recent merger or pending merger with Nuvance), the Northwell network possesses a predominant share of the market for healthcare professionals in the metropolitan New York region and in localities and communities within this region of New York State.

49.     Healthcare professionals such as Ms. Dinu who seek employment do so within a marketplace for their healthcare expertise—and such "market" is protected from anticompetitive constraints by laws prohibiting restraints on trade.

---

[4] Nuvance Health a/k/a "Nuvance".

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 11 of 45

50.     Healthcare professionals' "product" is their labor or services in the field of health care.

51.     In local regions and communities in the New York metropolitan area, particularly Dutchess, Westchester and Nassau counties, the Northwell network is the sole or major healthcare purchaser of healthcare professionals' labor.

52.     As such, it is a monopsonist.

53.     Monopsony harms in healthcare labor markets, for example, by suppressing wages after hospital consolidation.

54.     In this regard, the Department of Justice Antitrust Division and Federal Trade Commission's joint *Antitrust Guidance for Human Resources Professionals* (2016) states that:

> "Agreements among employers not to recruit certain employees or not to compete on terms of compensation are illegal."

55.     As alleged in this complaint, this is what the Defendants are doing.

56.     In many locations (e.g., Putnam and Dutchess counties and portions of Long Island and Staten Island), the Northwell network is dominating the hospital healthcare labor market.

57.     For example, in Dutchess County, where Ms. Dinu resides, the only health system is Northwell's (noting its recent merger or anticipated merger with Nuvance Health).

58.     Northwell's control of over 80% of speech pathologist positions in Dutchess County (post-Nuvance merger).

59.     As a quantitative metric, as to speech pathologists, this yields a Herfindahl–Hirschman Index (HHI)[5] score exceeding 6,000, which is far above the U.S. Department of

---

[5] *See generally*, https://en.wikipedia.org/wiki/Herfindahl%E2%80%93Hirschman_index .

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 12 of 45

Justice's[6] "highly concentrated" threshold of 2,500.

60.     Ms. Dinu likewise sought new employment in Queens and Staten Island (and elsewhere).

61.     Similar Herfindahl–Hirschman Index analysis likewise reveals Northwell market share dominance in Queens and Staten Island.

62.     In Queens, Northwell commands the largest hospital bed capacity, significantly surpassing all other providers, with twice as many beds as the next largest competitor, Jamaica Hospital.

63.     In Staten Island, Richmond University Medical Center is Northwell's (Staten Island University Hospital's) only competitor, with 448 beds compared to Northwell's 668 beds.

64.     Because of the above labor market concentration, restricting the pool of qualified candidates – such as through blackballing, blacklisting or being placed on a "DNR" or "do not re-hire" list– has anticompetitive effects including depressing wages, limiting job mobility or imposing anticompetitive conditions.

65.     The anti-competitiveness is exacerbated when it comes to specialized healthcare professionals such as Ms. Dinu, because where, as here, there is an inelastic supply of specialized healthcare professionals, monopsony power becomes even more acute.

66.     Northwell's labor dominance has created precisely the type of harm that the Donnelly Act and parallel federal antitrust law seek to prevent. *See, e.g.*, *Suresh Naidu, Eric Posner & E. Glen Weyl, "Antitrust Remedies for Labor Market Power*," COASE-SANDOR WORKING PAPER SERIES IN LAW AND ECONOMICS, No. 850, UNIV. OF CHICAGO LAW SCHOOL

---

[6] *See*,  https://www.justice.gov/atr/herfindahl-hirschman-index#:~:text=The%20agencies%20generally%20consider%20markets,Guidelines%20%C2%A7%202.1%20(2023) .

(2018).[7]

67.     The joint U.S. Department of Justice's and Federal Trade Commission's 2023 Merger Guidelines explicitly address labor monopsony, noting buyer power over labor as a primary antitrust concern.[8]

68.     By blacklisting Ms. Dinu within its network of affiliates, Northwell and the Hospital Defendants:

    a.  Deprive Ms. Dinu of all "director" level hospital jobs within commuting distance of her home (in Dutchess County) east of the Hudson River;

    b.  Unduly limit Ms. Dinu of speech pathologist jobs within commuting distance of her home (in Dutchess County) east of the Hudson River;

    c.  Unduly limit Ms. Dinu's employment opportunities elsewhere, for example, in Staten Island, where Northwell has only one much-smaller competitor, and likewise in Queens, where Northwell has a commanding presence, and

    d.  Deprive Ms. Dinu of all department director, speech pathologist and other jobs within the Northwell network (which now includes Nuvance).

69.     Other similarly-situated blacklisted former employees of the Defendants are similarly affected.

70.     The above must also be viewed as an attempt by Northwell to monopolize (or become a monopsonist in) the healthcare market for skilled workers.

71.     For example, within 40 miles of where Ms. Dinu lives in Dutchess County, the only significantly sized non-Northwell/non-Nuvance hospital east of the Hudson River is the Mid-Hudson Regional Hospital.

---

[7] Available at
https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=2532&context=law_and_economics .

[8] *See*, https://www.justice.gov/atr/merger-guidelines at pages 26 - 27 (mergers can lessen competition for labor), 42 & 48 ("wages and other aspects of working conditions….").

72.    Northwell provides additional funding to its affiliates for the purpose of out-
competing non-Northwell hospitals, and thus an effort to monopolize (and monopsonize).

73.    In view of Northwell's market dominance, including its control over the
procurement of healthcare talent, its collusion with its affiliates to limit entry by the labor market
for healthcare professionals into its network is both unreasonable and unlawfully
anticompetitive.

### C.  Northwell's increasing concentration of market power

74.    The relevant market in this case is the labor market.

75.    Northwell is engaged in increasing its concentration of power in the labor market,
including serving as the employee-hiring-gatekeeper for its affiliates.

76.    Here, the Hospital Defendants can (and do) collude in a manner that screens, and
thus restricts the number of, job applicants available to be considered by each Northwell affiliate.

77.    This is an exercise market power detrimental to both consumers and healthcare
professionals (who expect, and are entitled to, a competitive market for their skills).

78.    Market concentration is one of the primary factors affecting the feasibility of
successful collusion.

79.    Here, all power in implementing the group boycott of "undesirable" or
"potentially adversarial" candidates rests with Northwell and its CEO, with its affiliated
corporations (the other Hospital Defendants) cooperating with and aiding Northwell in this
regard.

80.    As the Supreme Court has taught, as concentration in a particular market
increases, the "greater is the likelihood that parallel policies of mutual advantage not
competition, will emerge."  *See*, *United States v. Aluminum Co. of America*, 377 U.S. 271, 280

(1964).

### D. __Hospital Defendants' group boycott (blacklisting) in Restraint of Trade__

81.     The Hospital Defendants have colluded, and arranged, that "undesirable" former employees such as Ms. Dinu—namely, employees who engaged in protected activity, including opposing unlawful discrimination and reporting threats to patient safety—will not be considered for future employment by any Northwell affiliate.

82.     The Defendants do so by using Northwell as a gatekeeper—akin to an exclusive employment agency—to screen out (boycott) applicants blacklisted and blackballed within Northwell's network.

83.     This is an anticompetitive and illegitimate group boycott.

84.     Specifically, the Hospital Defendants boycott and refusal to deal with persons any one affiliate deems undesirable for rehire including, as most relevant here, persons who previously accused a Northwell affiliate, or Northwell itself, of unlawfulness such as unlawful discrimination or unlawful reprisal.

85.     Applicants are blacklisted if they have, for example, previously complained of illegality by their employer (either a Northwell affiliate, or Northwell itself).

86.     Thus, if Northwell or any one affiliate decides that an individual should be boycotted, the entire Northwell system of "separate," "standalone" corporations boycotts the individual.

87.     This amounts to a group boycott and refusal to deal with disfavored former employees, or former employees viewed as adversarial, and as such is a form of price fixing or market allocation, in restraint of trade.

88.     As a group boycott—the conduct is, and must be, deemed *per se* anticompetitive

14

Case 7:25-cv-09972-JGLC   Document 1-1   Filed 12/01/25   Page 16 of 45

and an unreasonable restraint on trade.

### E. Northwell affiliates are "separate business entities" and compete against each other

#### a.   *"Stand-alone business entities"*

89.     In Ms. Dinu's prior litigation against Northwell,[9] Northwell has asserted that its affiliate hospitals—for example, Phelps Hospital—are "standalone" and "separate business entities."

90.     Specifically, Northwell's counsel (Traycee Ellen Klein) stated to the N.Y.S. supreme court (Justice D'Alessio) at a court conference held in *Dinu v. Northwell Health* (*Dinu I*) on November 23, 2022 that:

> "[Ms. Dinu] is employed by Phelps Hospital. She's not employed by the named Defendant here, Northwell Health. *** They are separate businesses. They are standalone businesses. You can't tell one to hire another [employee]." (*emphasis added*)

91.     Logically, this also means that one hospital can't tell another hospital <u>not</u> to hire someone.

92.     Both the state court and Ms. Dinu have relied upon, and acted upon, Ms. Klein's above assertion that Northwell and its affiliates are separate businesses.

93.     Northwell's counsel has continued, to this day, to make this assertion in pending Appellate Division appeals in *Dinu I* and *Dinu II*.

94.     Accordingly, Northwell must be both judicially estopped and equitably estopped from arguing to the contrary.

95.     Ms. Klein' statement is a binding admission on Northwell's part.

96.     For antitrust purposes, Ms. Klein's statement also makes sense.

---

[9] *See*, The *Dinu I* and *Dinu II* litigations.

97.     The economic reality, for antitrust and restraint of trade purposes, is that Northwell's affiliates compete against each other in many ways, including but not limited to competition for funding, talent, grants, programs and prestige.

98.     Upon information and belief, each of the Northwell-affiliated defendant hospitals in this case has a board of directors that is independently responsible for ensuring that their particular hospital:

> a)     services the community in its geographical area;
>
> b)     establishes policy for the hospital, including on personnel matters;
>
> c)     provides guidance for the solicitation of donations from individual and corporate donors;
>
> d)     provides guidance and policy regarding specialized medical care;
>
> e)     provides guidance and policy as to competing with other Northwell affiliates for talent and resources (such as governmental grants or programs);
>
> f)     remains economically self-sufficient, to the maximum extent possible;
>
> g)     competes with other affiliates for patients, contractors and outside professionals (e.g., medical) services; and
>
> h)     ensures that hospital policies and practices are in compliance with the requirement of law.

99.     For the purpose of Ms. Dinu's Donnelly Act claim, Ms. Dinu is taking Northwell at its word that Northwell's affiliates are "separate" and "standalone businesses."

100.    Each Northwell affiliate, for antitrust purposes,[10] should be viewed as distinct economic entities.

101.    Specifically,

> ➢    each Northwell-affiliated hospital is its own corporate entity,
>
> ➢    with its own board of directors,
>
> ➢    with its own goals,

---

[10] But not for employment law purposes, especially since antidiscrimination law has as the main goal equal opportunity whereas antitrust law has as the main goal competitive market structure.

Case 7:25-cv-09972-JGLC     Document 1-1     Filed 12/01/25     Page 18 of 45

    ➢ with direct supervision of its own employees, and

    ➢ without direct control from Northwell, because Northwell considers its affiliates to be "separate businesses" and entities that Northwell cannot tell what to do.

102.    Notwithstanding that they are distinct corporate entities with competing economic and community interests, Northwell and its affiliates have entered into agreements and arrangements that identify people for exclusion within the Northwell network of affiliates.

103.    This prevents the person identified for exclusion (i.e., blacklisted -- in this case Ms. Dinu) from competing for jobs within Northwell's large geographical network of affiliated corporations.

104.    Ms. Dinu knows this because 1) she has been expressly told by Northwell representatives and 2) she has applied for jobs at <u>each</u> of the Hospital Defendants for which she was clearly qualified, after her 2023 termination and as recently as the summer of 2025, including positions for which she was told she would be granted an interview but ultimately was not.

105.    As alleged above, Ms. Dinu has repeatedly applied for speech pathologist jobs, yet denied an interview.

106.    When Ms. Dinu applied for the position of "director" at a Northwell affiliate, she was thereafter was told by a <u>Northwell</u> representative that she was an ideal candidate, only to be subsequently told by Northwell that Northwell and the affiliate would not consider her application.

107.    Ms. Dinu was not considered due to Northwell's (unlawful) boycott of affiliate employees or ex-employees whom the affiliate deems an undesirable candidate (and undesirable because, in Ms. Dinu's case, she blew the whistle on, and complained of, affiliate illegality).

    **b.**    ***Competitors for talent, resources and prestige—"soft competition"***

108.    As far as the labor market for healthcare professionals is concerned, there exists

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 19 of 45

"soft competition" within the Northwell network of affiliates.

109.    Northwell affiliates compete for grants, programs, prestige, and—critically—specialized labor.

110.    Evidence of "soft competition" among the Northwell affiliates is demonstrated by, for example, their separate boards of directors, distinct strategic plans, and competition for clinical and research programs and individual talent (employees).

111.    As to this soft competition, there is no "complete unity of interest" warranting the competing entities being viewed as one.

112.    Within the Northwell network, there is, for example, soft competition between the larger and the smaller Northwell hospitals in Queens (and everywhere else) for prestige within the Northwell network.

113.    There also exists strong cost competition between Northwell affiliates within the Northwell network, and conversely, salary competition, because healthcare professionals will want to work at the hospital that offers the best compensation/working environment benefits.

114.    The Northwell network's various affiliates (each a "standalone" and "separate" business entities) will compete for the most talented healthcare professionals, because with such individuals also comes research funding and specialty programs, which directly or indirectly increase the individual hospital's earnings, prestige and donor funding.

115.    For example, in Queens Northwell's flagship hospital, Long Island Jewish Medical Center completes against, and dominates, Jamaica Hospital, and is also in competition with Northwell's smaller hospital at Forest Hills.

       ***c.    Northwell anti-competitively allocates and segments markets***

116.    While Northwell's affiliates attempt to engage in soft competition, including in the hiring of personnel, Northwell hinders competition by orchestrating anticompetitive actions

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 20 of 45

such as market allocation and segmentation.

117.    Northwell, in collusion with its network of affiliates, often takes action to "segment" the market, so that when a person becomes a patient at one hospital (e.g., Northwell's Forest Hills Hospital), but then needs a higher level of care or would prefer a different hospital, the patient cannot easily depart the Northwell network but instead is induced to transfer to one of Northwell's larger hospitals (e.g., Northwell's LIJ Medical Center).

118.    This amounts to anticompetitive segmentation or allocation of the market.

119.    It also constitutes a vertical restraint of trade.

120.    It is also in the nature of an anticompetitive "tying" arrangement, as well as horizontal price fixing as to the local market for customers (patients).

121.    As relevant to Ms. Dinu's group boycott claims herein, if an employee such as Ms. Dinu complains of unlawfully discriminatory or illegal activity at the smaller facility, the Hospital Defendants group boycott then precludes her subsequent employment at the larger hospital.

### F.    Price-fixing by Northwell as the job application gatekeeper

122.    The consolidation of healthcare systems increases the ability to restrict, in an anti-competitively manner, the mobility of workers between facilities, and limits their employment opportunities within ever-enlarging monopolistic systems.

123.    The corporate employer—in alliance with other employers in the healthcare network—thus gain increased bargaining power vis a vis healthcare professionals seeking employment or wishing to relocate their employment.

124.    Upon information and belief, here Northwell attempts to control pricing among the "separate" and "standalone" corporations within the Northwell network of "affiliated"

19

corporate entities.

125.    Upon information and belief, Northwell also endeavors to manage (rig) what its affiliates pay to "Northwell employees," because the Northwell affiliates allow Northwell to coordinate with them because Northwell provides the employee candidate "gatekeeper" function.

126.    In this role, Northwell assists its affiliates in paying the lowest possible compensation for new talent, to the unfair and anticompetitive disadvantage of the candidates for employment.

127.    A candidate who requests an excessively high a salary may, under the gatekeeping structure established by with its affiliates, be blacklisted within the Northwell system.

128.    This allows for unlawful price fixing, by reducing the competitive pressure for higher salaries.

129.    Northwell appears to have now expanded its candidate screening gatekeeping to include the Nuvance network, thus expanding its geographical reach.

130.    When a job seeker goes to Northwell's "jobs" website, https://jobs.northwell.edu/, and searches for the job of "speech pathologist," on October 3, 2025 the job search would reveal 12 jobs, including several in the Nuvance system.

131.    Additionally, the Northwell job application site apparently gives a preference for persons currently-employed within the Northwell network, which necessarily excludes persons not employed within the Northwell network.

132.    Specifically the Northwell job website contains a link entitled "Northwell team members search and apply here," which link is accessed only with a Northwell "Universal ID and password."

20

133.    This exclusion is also a form of group boycott (of "outsiders") in restraint of trade.

134.    If other major healthcare networks in the New York metropolitan region similarly give a preference to hiring "from within" a network of "affiliated" entities, then competition for jobs is reduced, in restraint of trade.

## G. Embracing Lawlessness equates to Price-fixing using an illegitimate and anticompetitive condition

### a.    A legal/ethical culture has an economic value

135.    One type of compensation is "working environment benefits."

136.    Each of Northwell's affiliates is entitled to compete against other affiliates by providing attractive working environment benefits.

137.    This can include the particular affiliate's ethical and legal culture.

138.    For example, a healthcare professional may prefer to work at a hospital that respects employees' rights to complain about unlawful discrimination or to report patient safety issues, and may be willing to receive a lower salary if the employer has an ethical, law-abiding corporate culture.

139.    Where, as here, the Northwell network blacklists former employees because they have complained about unlawful discrimination or reported patient safety issues, it is engaging in a form of price-fixing.

140.    Specifically, it is reducing the value of the employee's compensation by imposing an anticompetitive condition, namely, that a healthcare provider that opposes unlawfulness may become blacklisted within the Northwell network.

141.    The market price for potential employees is thus reduced due to the coordinated arrangement among the Hospital Defendants to ban whistleblowers from consideration for future

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 23 of 45

employment.

142.    This is anticompetitive.

143.    If potential employees are informed that they will not be protected against illegality when applying for employment within the Northwell network (through Northwell's portal,[11] as gatekeeper) :

> a) they should demand higher compensation in return for giving up such rights,
>
> b) they should demand higher compensation in return for the likelihood that they will be blacklisted if they assert legal rights, and
>
> c) they should understand that the fair market value of their professional labor diminished because, if they subsequently assert their rights, they will be excluded from the Northwell network by being barred from competing for jobs offered by Northwell affiliates.

144.    The Northwell –Northwell affiliates' group boycotting/blacklisting of former employees that have demanded the protection of law means this the pool of candidates is eliminated from a substantial portion of the marketplace for such talent, which is anticompetitive.

145.    The group boycott is a "naked" free-market restraint.

> **b.    Blacklisting is akin to unlawful anti-poaching agreements, and also hinders poaching, in restraint of trade**

146.    The blacklisting involved here—against Ms. Dinu and similarly situated job candidates—can easily be used by one affiliate to threaten any employee desiring to move his or her place of employment to another affiliate.

---

[11] *See,* https://jobs.northwell.edu/   ("At Northwell Health, we're 100,000+ strong—caring for millions of individuals and their families who share our neighborhoods and communities. We are a Fortune 100 Best Workplaces in Healthcare, with locations spanning across Long Island, New York City, Queens, Staten Island, Brooklyn, Hudson Valley, Westchester, Connecticut and New Jersey.")

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 24 of 45

147.    For employees within the Northwell network, an implicit threat exists that seeking employment at another affiliate contrary to Northwell's directives, as the network's job opportunity gatekeeper, may result in blacklisting throughout the entire Northwell (now including Nuvance) network.

148.    This amounts to a de facto anti-poaching arrangement within the Northwell network.

149.    Upon information and belief, such is an actual or implicit threat used by the Hospital Defendants.

150.    Upon information and belief, the blacklisting of Ms. Dinu was at least in part motivated by Phelps Hospital's and Northwell's intent to retaliate against Ms. Dinu for exploring the possibility of employment outside of Phelps Hospital.

151.    Specifically, in an affidavit submitted by a Northwell official Elizabeth Dore while Ms. Dinu was still employed by Phelps Hospital/Northwell, Ms. Dore stated that she had knowledge that Ms. Dinu was looking for employment outside of Northwell.

152.    In other words, Northwell saw the risk that Ms. Dinu might be "poached" by another employer, and engaged in retaliation.  It signaled to other employees that seeking employment outside of the Northwell network will not be tolerated.

153.    After Ms. Dore learned that Ms. Dinu might be poached by another employer, she was involved in Phelps Hospital's and Northwell's coordinated effort to wrongfully take adverse job action against Ms. Dinu.[12]

154.    Blacklisting a person for exploring his or her options in the marketplace, and

---

[12] This presents a fact issue that may be determined in a different litigation, e.g., *Dinu III*, pending before this Court, and thus result in collateral estoppel.

23

punishing them with a group boycott for looking for other employment, amounts to another form of price-fixing and should be viewed as *per se* anticompetitive.

155.    It is an anti-poaching strategy, and as such amounts to an unlawful restraint of trade.

### H.  A retroactive, unilaterally imposed Covenant Not to Compete

156.    The Hospital Defendants group boycott can also be viewed as akin to a retroactive, unilaterally imposed covenant not to compete ("CNTC").

157.    CNTCs are viewed as unreasonable restraints of trade absent sound justification and a well-defined and reasonable scope.

158.    The economic consequences for restraint on trade by being blackballed for whistleblowing are identical to the consequences when an employee agrees to an unlawful CNTC.

159.    The Hospital Defendants group boycott should thus be viewed as akin to an unlawfully anticompetitive CNTC.

160.    In both instances, an ex-employee is denied the opportunity to compete for work, thus denying the local or regional community of the benefit of an able-bodied economic contributor and potentially denying the blacklisted individual a livelihood.

161.    Discovery may reveal whether settlement agreement drafted by Northwell contain language precluding applying for future employment with Northwell, as many employers include these.

162.    If Northwell does not insert such a provision barring future employment with its affiliates, this is presumably due to Northwell's gatekeeping role makes such provision unnecessary.

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 26 of 45

# I. __Northwell takeover of community hospitals with, e.g., interlocking Boards of Directors__

163.    Upon information and belief, Northwell and its CEO, Michael Dowling, have been endeavoring to take over community hospitals, and to do so with monopolistic intent.

164.    Upon information and belief, one or more of the Hospital Defendants are creating interlocking corporate boards of directors, and thus engaging in an anticompetitive practice.

165.    Northwell took over (is the "sole member" of) Phelps Hospital, and as such it, and its CEO, exercise the power to appoint Phelps Hospital's board of directors.

166.    Northwell likewise has taken over one or more of its affiliated hospitals named as defendants herein.

167.    This interlocking control allows the group boycott used by the Hospital Defendants.

168.    The group boycott prevents  network-affiliated community hospitals from hiring talented individuals such as Ms. Dinu.

169.    This is anticompetitive.

### i.    Blacklisting candidates for Northwell's non-profit community hospitals is anticompetitive

170.    Each of the Hospital Defendants herein is not-for-profit corporations established under New York Law.

171.    Nonprofit hospitals or organizations that engage in price-setting or other market-affecting activities are subject to antitrust laws.

172.    One or more of Northwell's affiliated hospitals are "community hospitals."

173.    Upon information and belief, the core mission and primary responsibility of one or more of the Hospital Defendants, as community hospitals, is to serve the community's health needs, rather than to generate unnecessary profit.

25

Case 7:25-cv-09972-JGLC   Document 1-1   Filed 12/01/25   Page 27 of 45

174.    A community hospital may desire to employ talented individuals—persons such as Ms. Dinu or similarly capable individuals fired for unlawful reasons—but forfeits that ability once the community hospital becomes subject to outside control by another entity (here Northwell) and as a consequence (e.g., because of interlocking boards), is bound by the Northwell network's group boycott.

175.    To the extent that "community hospitals" include board members from the local community, their interest most likely will <u>not</u> be profit generation for the Northwell network, but instead the best possible service for patients with the best possible (and lawful) working conditions for employees.

176.    The "community hospital's" Board of Directors can reasonably take the policy view (as explained by a U.S. District Court in the U.S. 8th Circuit) that:

> "…a private nonprofit hospital that is sponsored and directed by the local community is similar to a consumer cooperative. It is highly unlikely that a cooperative will arbitrarily raise prices merely to earn higher profits because the owners of such an organization are also its consumers. Similarly, if a nonprofit organization is controlled by the very people who depend on it for service, there is no rational economic incentive for such an organization to raise its prices to the monopoly level even if it has the power to do so. In the hospital context, this rationale applies to nonprofit hospitals whose boards are effectively controlled by persons representing the interests of hospital consumers or other groups that desire competitively-priced hospital services.
>
> To determine if this theory is applicable in a given context, it is necessary to evaluate who controls the hospitals. Local businesses have an interest in competitively- priced hospital services, because they pay those prices through the cost of their employees' hospitalization. Physicians also have an interest in maintaining competitive prices at the hospitals where they practice because higher prices drive patients to alternative hospitals, thus causing a reduction in the physicians' patient volume."[13]

---

[13] *See*, *F.T.C. v. Freeman Hosp.*, 911 F. Supp. 1213, 1222–23 (W.D. Mo.), *aff'd*, 69 F.3d 260 (8th Cir. 1995).

26

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 28 of 45

177.    Upon information and belief, some or all of the Hospital Defendants that are "community" hospitals have taken the above policy position regarding their non-profit corporation.

178.    The foregoing policy position is legally sound with respect to trade and competitiveness.

179.    The blacklisting of Ms. Dinu and similarly situated healthcare professionals contravenes the policy and mission of community hospitals and is anticompetitive, as gatekeeper Northwell prevents blacklisted employees from applying for such positions within Northwell's network.

180.    This reduces the number of qualified applicants available to non-profit hospitals, by reducing competition in this labor market.

## J.    A group boycott "arrangement"

181.    As to the above, Northwell and its affiliates have all entered into an express or implied "contract, agreement, arrangement or combination that restrains competition" by preventing qualified people from being considered for the services the healthcare professional can provide.

182.    Thus, Northwell and its affiliates have effectuated a group boycott and concerted refusal to deal, in violation of the Donnelly Act.

183.    The arrangement is also a form of price fixing, because Northwell eliminates for all of its affiliates the increased "cost" or "price" it associates with employees or ex-employees who are willing to assert legal rights against any one affiliate.

184.    In other words, with its boycott, Northwell and its affiliates effectively eliminate the cost of complying with federal and state employment laws—the risk or expense of a future

27

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 29 of 45

employee asserting their legal rights.

185.    This is <u>very</u> unlawful price-fixing, because the price of the blacklisting also includes instilling fear in other employees in their exercise of legal rights, which intimidation will have a chilling (and anticompetitive) effect by dissuading qualified professionals from entering this market and offering their services.

### K.    100,000+ employees affected by the anticompetitive illegality

186.    The Hospital Defendants policy and practice of blacklisting, using Northwell as a clearinghouse, has harmed not only Ms. Dinu, but also harms or potentially harms all individuals presently employed by any of the Hospital Defendants, as well as all individuals previously employed but now blackballed from employment.

187.    Excluding qualified healthcare workers from the Northwell network's workforce harms overall competition, affecting both speech pathologists such as Ms. Dinu seeking positions in the New York metropolitan region and other healthcare professionals employed by, or seeking work within, the Northwell network.

188.    As to each of Northwell's 88,000+ employees, an employed worker may, for example, be afraid to complain that he or she is not being properly paid for overtime work, because if terminated for complaining, no other healthcare position will be available due to Northwell blacklisting.

189.    If every major healthcare system were to follow Northwell's blacklisting policy, the marketplace would become skewed in favor of employers over employees, with employers possessing undue leverage, an anticompetitive result.

190.    The Northwell network's system-wide blacklist is particularly anti-competitive by being an "arrangement" that robs each affiliate hospital of its independent right and ability to

assess and hire the most qualified candidate.

> **i.    The Northwell network is restraining competition both locally and regionally**

191.    Northwell has obtained, or is seeking to obtain, monopoly power regarding the employment of healthcare workers in some or all parts of the New York metropolitan region.

192.    Specifically, Northwell has obtained such monopoly power in substantial parts of Long Island, as well as in suburban counties north of New York City on the east side of the Hudson River after its merger or pending merger with Nuvance Healthcare (which merger raised antitrust concerns by regulatory officials[14]).

193.    The arrangements among the Hospital Defendants whereby each uses Northwell for employment decisions, even though Northwell purports not to be the employer when employment litigation arises, restrains trade, by eliminating qualified potential candidates for employment consideration by Northwell "affiliates."

194.    Ms. Dinu's experience is an instructive example of a person victimized by Northwell's restraint on trade.

195.    Ms. Dinu is highly skilled, highly qualified speech pathologist, yet because of what Phelps Hospital characterized as a managerial skills problem and one incident involving a quality-of-care issue (where Ms. Dinu was attempting to protect a six-year-old child, as described in the complaint in *Dinu III*), Northwell and its CEO, Defendant Dowling, have blacklisted Ms. Dinu from employment throughout the entire Northwell network of affiliates.

---

[14] For example, regulators were concerned that with the merger, healthcare services might be lost in rural and less-densely populated areas. *See,* "Agreement of Assurances" with the N.Y.S. and Connecticut AGs, dated August 23, 2024.  https://portal.ct.gov/-/media/ag/press_releases/2024/agreement-of-assurances---northwell-nuvance.pdf?rev=af389c9ec765455c809182d50f894c49&hash=496477B29197E804048A8918E9D93CA1

ii. **Blacklisting for Whistleblowing is anticompetitive, because it chills the exercise of rights**

196.    Blacklisting of whistle-blowers bestows the employer with unfair economic leverage, and correspondingly takes away an employee's potential leverage to insist that the employer respect the law.

197.    The prospect of blacklisting also deters both employees and prospective employees regarding the exercise of legal rights, and this too is anticompetitive.

198.    Blacklisting hurts society, by depriving it of skilled healthcare workers such as Ms. Dinu.

199.    Northwell's policy and practice of blacklisting hurts employees similarly situated to Ms. Dinu, both by denying them employment opportunities, and by chilling their right to protect themselves against employer illegality, because doing so will result not only in job termination at their place of employment, but also throughout the entire Northwell network.

200.    Northwell's blacklisting policy hurts competition in the marketplace for healthcare workers by "allocating" jobs to "compliant and complacent workers," and denying any allocation to workers who have demonstrated a willingness to demand that Northwell and its affiliates act lawfully.

201.    "Allocating" customers (buyers of healthcare services) is no different from allocating former employees (sellers of healthcare services) for antitrust purposes.

202.    In New York's free market economy, one entity or group of entities is not allowed to dictate to other entities with whom they can deal, whether to buy from or sell to.

203.    Such market allocation is a *per se* restraint of trade for which the conspirators can

30

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 32 of 45

go to prison.[15]

204.    It is akin to organized crime (the "Mob") dividing up turf.

205.    This is what the Northwell network has done, by dividing human capital into desirable "territory" (with employees willing to endure illegality) and undesirable territory (employees who refused to be extorted).

206.    Northwell and its affiliates agree and arrange that "good" candidates are allocated as "employable" for all Northwell affiliates to consider, but that "bad" candidates cannot be considered by any affiliate.

207.    Northwell's gatekeeping is akin to a Mob protection racket, where "good" candidates are those willing to pay a kickback to the Northwell network in the form of silence if illegality arises, and "bad" candidates are those who refused to tolerate illegality (e.g., by protesting unlawful discrimination or reporting an unsafe situation).

208.    The Mob enforcer brakes kneecaps whereas the Hospital Defendants use Northwell's screening and DNR (do not rehire) label to injure and destroy healthcare careers.

209.    The result to the employees is as economically harmful, or worse, than a broken kneecap.  The employee's career and livelihood may be lost.

210.    The Northwell network's blacklisting is also a form of price fixing for a similar reason.

211.    Once an employee realizes how the system works, he or she realizes that there is a huge cost attached to complaining of discrimination or whistleblowing.

212.    Logically, the employee would not have taken the job in the first place, or demanded higher pay, had he or she known that a steep penalty would be imposed upon the

---

[15] *See*, *e.g.*, *People v Roth,* 52 N.Y.2d 440 (1981).

exercise of legal rights.

213.    Upon information and belief, the threat of blacklisting allows Northwell and its affiliates to pay workers a lesser amount of severance compensation, upon termination of employment, than the employee might otherwise agree to absent the implicit threat of being blacklisted by Northwell and the Hospital Defendants.

214.    This is because Northwell has the alternative of terminating the employee without a severance, and subsequently blacklisting the employee after he or she returns to the negotiation table and perhaps receives some severance.

215.    The mere ability to blacklist gives Northwell an unfair economic advantage in the marketplace for healthcare workers.

216.    Northwell's forcing all of its affiliates to boycott Ms. Dinu's job application denies the affiliate "independent decision-making," and also denies the free market the benefit of Ms. Dinu's skill set.

217.    Each Northwell affiliate is also competing against each other in the marketplace. *See*, *e.g.*, *American Needle, Inc. v. National Football League*, 560 U.S. 183 (2010).

218.    The Hospital Defendants are, by their collusive blacklisting, depriving the marketplace of the independent centers of decision-making that competition assumes and demands.

219.    Instead, each affiliate of the Northwell network is forced to be a team player by agreeing to Northwell's system of blacklisting.

220.    The Northwell network (and the Hospital Defendants herein) are not lawfully permitted to collude, yet they do.

221.    The Hospital Defendants are not lawfully permitted to banish and exclude

32

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 34 of 45

individuals from future employment because the individuals demand lawfulness, yet they do.

**L.** __The Hospital Defendants' reasons for blacklisting Ms. Dinu are unlawful__

222.     The Defendants' reason for blacklisting and boycotting Ms. Dinu is unlawful

retaliatory and was done because Ms. Dinu:

> ➢ asserted whistleblower protection under N.Y.S. Labor Law § 741 (after she sought to protect the safety of a six-year-old hospital patient in one of Northwell's affiliates, (Phelps Hospital) and

> ➢ was retaliated against for reporting sex and disability discrimination to Northwell (and to Phelps Hospital).

223.     This will be established in *Dinu III*, pending before this Court, and *Dinu V*,

pending in the federal U.S. District Court, and the facts determined therein may bind Northwell

and its CEO under the doctrine of collateral estoppel.

224.     After being demoted by Phelps Hospital, by email dated July 31, 2022, Ms. Dinu

wrote CEO Dowling, in relevant part, as follows:

> "Dear Mr. Dowling,
> In request your intervention to correct an injustice against me as a dedicated and loyal employee of Northwell.  Until recently, I was the Director of Speech and Audiology at Phelps Hospital. <u>After I complained of unlawful discrimination and reprisal against me, I was removed from the position of Director.</u>  ***
> As to the above, first, the accusations against me are incorrect, and second, to the extent that management and human resources officials at Northwell and Phelps Hospital desire to act in good faith and lawfully as to my job application for the Director's position, they should consider the physical impairments that I developed (e.g., partial deafness and panic disorder) after undergoing brain surgery in 2018. I am informed that <u>I am entitled to a "reasonable accommodation" regarding my actual or perceived disabilities.</u>  Because my actual or perceived disability is the only good faith justification that Northwell might have for its disciplinary action against me, <u>Northwell must have a dialogue with me about how and why my actual and perceived disabilities have resulted in unfair criticism of me, and how my actual or perceived disabilities can and should be accommodated regarding my pending application for the position of Director.</u>
> Your assistance will be much appreciated.
> Sincerely yours,
> /s/  Paula Dinu, MS-CCC/SLP, BCS-S

225.     Based upon this letter to Northwell CEO Dowling, Northwell was put on notice

33

that Ms. Dinu desired employment at the management level, and that her demotion was the result of unlawful discrimination and reprisal.

226.    Ms. Dinu was also writing CEO Dowling because she was aware that Northwell was in control of hiring (and presumably also firings) within its monolithic "healthcare system"—a system that in CEO Dowling's own words is the "largest private employer in New York State."

227.    After Ms. Dinu sent her letter to CEO Dowling, he and the corporations under his control[16] not only countenanced Phelps Hospital's conduct, but also permitted, and perhaps instructed, Northwell's in-house and outside counsel to blacklist Ms. Dinu.

228.    Until around the time of her July 2022 letter to CEO Dowling, Ms. Dinu had no reason to suspect that any dispute she had with the management of Phelps Hospital would affect her potential employment opportunities outside of Phelps Hospital.

229.    Ms. Dinu had no reason to believe that "third party" corporations (e.g., Northwell's affiliates) would or could use Ms. Dinu's disagreements with Phelps Hospital management against her, or that Phelps Hospital, Northwell or CEO Dowling would communicate derogatory information to Northwell's ever-increasing number of "affiliates."

230.    Ms. Dinu had no reason to believe that, if she needed to apply to other hospitals for employment or consultant work in the future, that she would not have the opportunity to explain the circumstances of her departure from Phelps Hospital, namely, that she was fired for seeking to protect the safety of a six year old patient, and also retaliated against for having alleged sex and disability discrimination.

231.    She was not aware that Northwell was developing a combination of hospitals

---

[16]  Defendant Northwell has repeatedly claimed the entities are distinct.

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 36 of 45

whose overall "senior leadership" included Defendant Dowling as President and CEO.[17]

232.    This retaliation, which wrongfully used concerted action, proximately caused Ms. Dinu damage, namely, an inability to find comparable employment that she held at Phelps Hospital before being wrongfully demoted and thereafter terminated.

### M. No antitrust exemption applies to Ms. Dinu

233.    Northwell has asserted that there exists an antitrust and Donnelly Act exemption for physicians and lawyers, as members of a "learned profession."

234.    Ms. Dinu is not covered by such an exemption, as she is not a physician nor a member of a "learned profession."

235.    Her highest level of education is a Master's degree—a level of degree held by some nurses, many high school teachers, some engineers and workers in many other occupations, none of whom are considered members of a "learned profession."

236.    Accordingly, no antitrust exemption applies to Ms. Dinu.

### N. Ms. Dinu has been damaged greatly by Northwell actions in restraint of trade

237.    Ms. Dinu has exceptional experience and expertise in speech pathology.

238.    Blackballing Ms. Dinu within the Northwell consortium deprives all of the affiliated hospitals from considering her for employment, solely because one "community hospital" affiliate (Phelps Hospital) decided to terminate her employment, and Northwell provided the means to enforce that blacklisting.

239.    This blacklisting is particularly harmful to Ms. Dinu because of her qualifications and experience at the director level but where she is now denied even an entry level position.

240.    Because the management level positions are so scarce, Ms. Dinu would need to be

---

[17] *See*, 2024 Annual Report at pages 45-49

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 37 of 45

employed by a Hospital in order to have any prospect of advancing back up to the level she once held as director.

241.    There are other large Health Care systems in New York State (New York-Presbyterian, Mount Sinai, NYU Langone, Montefiore, and Kaleida Health), but Ms. Dinu could face blacklisting in the systems as well if their centralized personnel offices identify her as blackballed by Northwell, in which case she will suffer the same fate in those systems as in the Northwell system.

242.    Besides not being able to obtain comparable replacement employment, Ms. Dinu also suffered great mental distress and exacerbation of her pre-existing psychological disability (acute stress disorder) as a result of being unlawfully blacklisted within the Northwell consortium.

243.    For Ms. Dinu's wrongful termination (*Dinu III*) and Donnelly Act claim (here), her damages including lost wages to the present amounting to approximately $400,000, lost front pay estimated to be well over $1 million, lost benefits, damage to her professional reputation, and emotional distress damages in excess of $2 million, all stemming directly from her wrongful termination and associated blacklisting.

### O.  Appropriate Declaratory Relief

244.    In addition to an award of damages, appropriate declaratory relief should include a direction that the Hospital Defendants refrain from engaging in internal "investigation" of job applicants and then blacklist, and as a group boycott, applicants based upon a one-sided assessment of the candidate, without the candidate being able to respond and directly address the job application decision-maker.

245.    For the Hospital Defendants to do otherwise will be to allow defamatory assessments, such as a unilateral characterization of a termination being "for cause", or a

determination to blacklist because of a person's exercise of legal rights. Both scenarios may result in a person being unreasonably blacklisted, defamed or excluded for asserting legal rights.

246.    Any and all of this amounts to an unreasonable restraint on trade.

247.    Ms. Dinu has been damaged by being denied employment for which she was fully qualified, forcing her to eventually find lower paying work elsewhere.

248.    As discussed next, many other former employees of the Northwell system have, and will be, similarly adversely affected.

### CLASS ACTION ALLEGATIONS

249.    Plaintiff brings this action pursuant to CPLR Article 9 on behalf of herself and a class of similarly situated individuals who, within the applicable limitations period, were employed by one or more of the Hospital Defendants and thereafter were denied re-employment, hospital privileges, or contractor opportunities based on Defendants' centralized "do-not-hire," blacklisting, or group-boycott policies described herein (the "Class").

250.    If, for example, 0.1 percent of the Northwell system's approximately 88,000 employee are similarly blacklisted within the applicable limitations period, such that this reflects the class, this amounts to 88 employees with compensable claims.

251.    If the average additional time spent to locate new employment is 3 months, and the average annual salaries $90,000, this means $30,000 damages per employee, for a total amount of damages for the class equal to $ 2,640,000.

### A. Numerosity – CPLR 901(a)(1)

252.    The Class is so numerous that joinder of all members is impracticable. Northwell publicly states that it employs over 88,000 individuals, and even a small percentage suffering blacklisting—as alleged herein—would result in dozens of affected persons. Plaintiff estimates that at minimum 0.1% of the workforce (approximately 88 individuals) is impacted, rendering

Case 7:25-cv-09972-JGLC     Document 1-1     Filed 12/01/25     Page 39 of 45

joinder impracticable.

## B. Commonality – CPLR 901(a)(2)

253.     There exist numerous common questions of law and fact affecting the Class that predominate over any individualized issues. These common questions include, without limitation:

(a) whether the Hospital Defendants entered into an unlawful "contract, agreement, arrangement or combination" within the meaning of the Donnelly Act to blacklist, boycott, or refuse to deal with former employees;

(b) whether Northwell acted as a centralized gatekeeper for hiring decisions across its affiliate hospitals;

(c) whether Defendants' "do-not-hire" or blacklisting practices constitute a per se unlawful group boycott;

(d) whether Defendants' conduct restrained competition in labor markets for healthcare professionals;

(e) whether Defendants' conduct caused economic injury to Plaintiff and the Class; and

(f) the measure of damages.

## C. Typicality – CPLR 901(a)(3)

254.     Plaintiff's claims are typical of the claims of the Class because she, like all Class members, was subjected to Defendants' uniform blacklisting and refusal-to-deal policies, suffered loss of employment opportunities, had hospital privileges revoked, and incurred economic and reputational injury as a result of the same unlawful anticompetitive conduct.

## D. Adequacy – CPLR 901(a)(4)

255.     Plaintiff will fairly and adequately protect the interests of the Class.

256.     Plaintiff has no interests antagonistic to or in conflict with those of the Class.

38

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 40 of 45

Plaintiff has demonstrated substantial commitment to prosecuting these claims and has already undertaken multiple lawsuits arising from the same underlying retaliatory and anticompetitive conduct.

257.    Plaintiff's counsel is experienced in complex litigation, civil rights law, and employment law matters, in state and federal trial and appellate courts, and will vigorously represent the interests of the Class.

### E.  Predominance – CPLR 901(a)(2) & 902

258.    The common issues of law and fact described above predominate over any individual issues because Defendants' course of conduct was centralized, uniform in operation, and applied systematically to all former employees whom Defendants deemed "undesirable."

259.    Liability under the Donnelly Act turns on Defendants' collective behavior—not on individualized employment circumstances—making class-wide adjudication not only appropriate but essential.

### F.  Superiority – CPLR 901(a)(5).

260.    A class action is superior to other available methods for a fair and efficient adjudication of this controversy.

261.    Individual claims involving relatively modest lost wages, salaries, lost privileges, or reputational harm would be economically unfeasible to litigate separately.

262.    Moreover, Defendants' blacklisting structure—centralized, system-wide, and algorithmically reinforced—can only be properly challenged on a class-wide basis.

263.    Class treatment promotes judicial economy, prevents inconsistent adjudications, and ensures that Defendants are held accountable for systemic anticompetitive practices that would otherwise evade review.

264.     Class certification is therefore appropriate under CPLR 901(a) and CPLR 902.

**FIRST CAUSE OF ACTION--**
**VIOLATION OF THE DONNELLY ACT DAMAGING MS. DINU**

265.     Ms. Dinu repeats and reiterates each of the allegations above as if fully repeated

here at length.

266.     The Donnelly Act, General Business Law (GBL) § 340, provides in relevant part:

"1. Every contract, agreement, arrangement or combination whereby

A monopoly in the … the furnishing of any service in this state, is or may be established or maintained, or whereby

Competition or the free exercise of any activity in the … furnishing of any service in this state is or may be restrained or whereby

For the purpose of establishing or maintaining any such monopoly or unlawfully interfering with the free exercise of any activity in the … furnishing of any service in this state … is or may be restrained, is hereby declared to be against public policy, illegal and void."

*See*, N.Y. Gen. Bus. Law § 340.

267.     Defendants have engaged in a "contract, agreement, arrangement or combination"

whereby:

➢ "A monopoly [or monopsony] in … in the furnishing of any service [Ms. Dinu's speech pathology services and the services of other similarly-situated healthcare professionals] is or may be established or maintained…,"

➢ Competition or the free exercise of … furnishing of any service …may be restrained…."

268.     The Donnelly Act prohibits such conduct, declaring it "against public policy,

illegal and void," and authorizing a civil action for damages.

269.     The Hospital Defendants have violated the Donnelly Act.

270.     Specifically, through concerted action, the Defendants have contracted, agreed

and arranged that the Hospital Defendants will engage in a group boycott and concerted refusal

40

Case 7:25-cv-09972-JGLC    Document 1-1    Filed 12/01/25    Page 42 of 45

to deal with blacklisted former employees, such as Ms. Dinu, thereby restraining trade and
reducing competition for healthcare service providers.

271.    By revoking Ms. Dinu's hospital privileges because she is blacklisted, the
Defendants also engaged in a concerted refusal to deal with her as an independent contractor or
non-employee healthcare provider.

272.    The Hospital Defendants—each a separate corporation and separate economic
entity—have blackballed Ms. Dinu and similarly situated former employees, which is
anticompetitive and in restraint of trade, impairing each Northwell affiliate's ability to compete
for talent in a free market.

273.    The Hospital Defendants are attempting to create a monopoly as a purchaser of
professional services, excluding candidates who might whistle-blow or complain of unlawful
discrimination.

274.    By excluding persons who complain of unlawful discrimination, other unlawful
activities or unlawful reprisal—including practices that endanger patients—the Hospital
Defendants are attempting to create a professional workforce (and monopoly in) of healthcare
workers afraid to report illegality out of fear of being blacklisted.

275.    Where, as here, the hospital system blacklists a speech pathologist because of her
gender, her disability, and her reporting a safety violation, this violates not only her right to
protection under statutes such illegality, but also violates hospital patients' right be cared for in a
manner that comports with law, including laws designed to ensure patient safety.

276.    Additionally, discrimination undermines healthcare efficiency and innovation,
and thus affects the marketplace, harming market competition (as has so opined the U.S. EEOC).

Case 7:25-cv-09972-JGLC     Document 1-1     Filed 12/01/25     Page 43 of 45

277.    The Hospital Defendants are imposing upon former employees what amounts to retroactive covenants not to compete (CNTC), and are engaged in conduct that is the anticompetitive equivalent to a CNTC.

278.    The Hospital Defendants blacklisting affects a substantial share of the marketplace; restricts the ability of many healthcare providers to compete; and harms employees, ex-employees, patients, the public and the free market.

279.    Plaintiff has been damaged thereby.

280.    Plaintiff is entitled to treble damages under the Donnelly Act against the Hospital Defendants.

## SECOND CAUSE OF ACTION--
## VIOLATION OF THE DONNELLY ACT DAMAGING THE PROPOSED CLASS

281.    Ms. Dinu repeats and reiterates each of the allegations above as if fully repeated here at length.

282.    The anticompetitive wrongdoing done by the Hospital Defendants against Ms. Dinu, and the resulting economic harm, has been similarly experienced by all members of the proposed class.

283.    The members of the proposed class have been damaged thereby, in an amount estimated to be above $3 million but under $5 million.

284.    As to the class action, the class will not seek from the Defendants a penalty in the form of treble damages. The class will seek only actual damages, because CPLR § 901(b) does not allow a class action "to recover a penalty."[18]

---

[18] If Defendants challenge the right of the class to proceed on actual damages alone, then Plaintiff will request that the Court allow further amendment of the complaint to allow the class to assert causes of action under the Sherman Antitrust Act, 15 U.S.C. §§1–2, and Clayton Antitrust Act, 15 U.S.C. §§ 12–27

42

### THIRD CAUSE OF ACTION--
### TORTIOUS INTERFERENCE WITH MS. DINU'S AND THE PROPOSED CLASS PROSPECTIVE CONTRACTUAL RELATIONS

285.    Ms. Dinu repeats and reiterates each of the allegations above as if fully repeated here at length.

286.    Neither Ms. Dinu nor members of the proposed class anticipated that having a falling out with their employer (Northwell or one of its affiliates) would result in being blacklisted in the entire Northwell system.

287.    Rather, Ms. Dinu and similarly situated employees of the Defendant reasonably expected being able to find new employment from another hospital in the region, notwithstanding any affiliation with Northwell.

288.    The Defendants knew or reasonably expected that Ms. Dinu and other similarly situated ex-employees would seek further employment from other potential employers (those affiliated with Northwell).

289.     Defendants intentionally and wrongfully interfered with Ms. Dinu's and similarly situation employees' ability to find new employment with Northwell-affiliated hospitals.

290.    Defendants conduct was wrongful because, among other things, it was in restraint of trade and/or retaliated against ex-employees for their exercise of their legal rights, including but not limited to their right to report hospital wrongdoing (e.g., under Labor Law § 740 or § 741) or unlawful discrimination or reprisal in violation of, for example, Title VII, the ADA or the N.Y.S. Human Rights Law.

291.    Ms. Dinu and the proposed class were damaged thereby.

---

and 29 U.S.C. §§ 52–53.

43

## JURY DEMAND

Ms. Dinu and the class demand trial by jury in this action.

WHEREFORE, Plaintiff prays that this Court grant her and the proposed class judgment containing the following relief:

a)  Awarding Plaintiff compensatory damages;

b)  Awarding Plaintiff punitive damages;

c)  Allowing Plaintiff's class action to proceed forward;

d)  Treble damages as to Ms. Dinu individually, but not as to the class;

e)  Declaratory relief;

f)  Granting Plaintiff an award of attorney's fees and costs; and

g)  Such other and further relief as this Court may deem just and proper.

Dated:  Stony Point, New York
        November 14, 2025

    ____/S/ *Michael Diederich, Jr.* _____
    MICHAEL DIEDERICH, JR.
    *Attorney for Plaintiff*
    DIEDERICH LAW OFFICE
    361 Route 210
    Stony Point, NY 10980
    (845) 942-0795
    Mike@DiederichLaw.com